# In the United States Court of Federal Claims

No. 23-2087C
(Filed: July 16, 2024)
UNDER SEAL[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

METROIBR JV LLC,

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant,*

    and

IGNITEACTION LLC,

       *Intervenor.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *James Y. Boland*¸ Tysons Corner, Virginia, for plaintiff, with whom were *Michael T. Francel*, *Kyle T. McCollum*, and *Lindsay M. Reed*.

    *Elizabeth M. D. Pullin* and *Alexander S. Brewer*, Washington, DC, Trial Attorneys, United States Department of Justice, Commercial Litigation Branch, Civil Division, for defendant, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia McCarthy*, Director, *Douglas K. Mickle*, Assistant Director. *Jillian Stern* and *Jonathan S. Baker*, Office of General Counsel, U.S. Department of Commerce, of counsel.

---

[1] Pursuant to the protective order in this case, this opinion is issued under seal to afford the parties the opportunity to propose redactions of any protected information. The parties are directed to confer and propose redactions to chambers on or before July 30, 2024.

*Michael D. McGill*, Washington, DC, for intervenor.  *Thomas A. Pettit* of counsel.

OPINION

BRUGGINK, *Judge*.

Pending in this bid protest action is plaintiff's motion for discovery and to supplement the administrative record.  Defendant and intervenor oppose the motion, although the government has added a number of documents to the record to complete it that are responsive to plaintiff's requests.  The motion is fully briefed, and oral argument was held on July 9, 2024.  Because plaintiff has presented good grounds to suggest that the record is incomplete and has demonstrated that some limited discovery is warranted, the motion is granted in part as explained below.

BACKGROUND

On November 15, 2023, the United States Census Bureau awarded task order No. 1333LB24F00000002 to the intervenor, IgniteAction LLC, pursuant to Request for Quotations No. 1333LB-23-CPMG-0001.  On December 5 and 6, 2024, the two disappointed bidders, Capital Technology Group and the plaintiff here, MetroIBR JV LLC, respectively, filed complaints challenging that award.[2]  Both allege that IgniteAction was ineligible for award because it could not—absent contracting teaming agreements ("CTAs") that they allege it did not have in place—meet the experience requirement necessary to be awarded the contract per the solicitation.  They both also challenge the reasonableness of their own individual ratings by the agency.  MetroIBR, however, further alleges that the lead evaluator for the agency was biased in favor of intervenor.  On January 3, 2024, plaintiff filed the present motion, asking the court to order defendant to fill certain gaps in the record and to permit it to serve written discovery on defendant and intervenor and conduct depositions of agency personnel.

Plaintiff also filed a motion for a preliminary injunction.  The court set a schedule shortly thereafter, culminating in both motions being heard on March 12, 2024.  On February 23, 2024, however, defendant filed a notice

---

[2] Capital Technology Group's protest was docketed as case number 23-2076C.

of corrective action in both pending protests and asked the court to suspend briefing on the pending motions.  The notices indicated that the Census Bureau intended to amend the solicitation with respect to CTAs and that it "reserve[d] the right to take any other corrective action reasonably warranted by its review."  Notice of Corrective Action 1 (Feb. 23, 2024) (ECF No. 33).  The court convened a status conference on March 1, 2024, at which the two protestors expressed their concern that the promised corrective action would either be unfair to them or inadequate to address their allegations.  The court asked the government to provide a more detailed and definite statement of its intended corrective action(s).  We also stayed further briefing and consideration of plaintiff's motions for discovery and a preliminary injunction.

On March 6, 2024, defendant filed a revised notice of corrective action, this time indicating that the agency intended to cancel the RFQ and award to intervenor, execute a bridge contract, reconsider its requirements, and eventually issue a new solicitation.  A status conference was held on March 12, 2024, in place of the previously scheduled argument on plaintiff's motions.  Plaintiff's motion for a preliminary injunction was subsequently denied as moot as it had since received award of a bridge contract.  *See* Plaintiff's Notice (Apr. 2, 2024) (ECF No. 44).

The announced intention to cancel the award and solicitation spawned three related follow-on protests.  Plaintiff and Capital Technology Group filed new complaints challenging the cancellation of the solicitation as without record support and alleging that it was a pretextual attempt at maintaining IgniteAction's eligibility for award.  IgniteAction, for its part, challenged the agency's actions as irrational and unsupported by the record.

We set briefing on cross-motions for judgment on the administrative record in the new IgniteAction docket, No. 24-424C.  Argument was held on June 18, 2024, at which we announced that the planned corrective action would be enjoined.  We issued the written injunction on June 20, 2024, and reactivated the motion to supplement and for discovery in the present action.  Permanent Inj. Order, No. 20424C (Fed. Cl. June 20, 2024) (ECF No. 51).  Defendant filed several corrections to the administrative record to add documents requested in plaintiff's motion, though it has only done so heretofore in the IgniteAction, No. 24-424 docket.  It represents that it will do so in this docket as well.

A brief background of the solicitation and source selection process will provide context for the discussion of the issues raised by the instant motion. On August 28, 2023, the Census Bureau issued Request for Quotations No. 1333LB-CPMG-0001, which sought quotes for a task order from holders of a General Services Administration ("GSA") Multiple Award Schedule ("MAS") contract Special Item Number 54151S – IT Professional Services. The work sought was to be in support of the Center for Enterprise Dissemination Services and Consumer Innovation ("CEDSCI"), an office within the Census Bureau, which runs the Bureau's effort to provide usable demographic and economic statistics to the public via its website.

MetroStar Systems, LLC, is the incumbent contractor assisting CEDSCI in this effort pursuant to the Enterprise Data Dissemination Environment ("EDDE") contract. MetroStar formed a joint venture with Imagine Believe Realize LLC to compete for the current award at issue; the new contract is called the Dissemination Systems Development and Support Systems ("DSDSS") contract. MetroStar has consistently received positive Contractor Performance Assessment Rating System ("CPARS") marks for its EDDE performance, though, as will be discussed later, there was a now-rescinded CPARS rating that is relevant to the dispute regarding the state of the record in this case.

The solicitation called for a two-phase process to compete for the work. During Phase I, offerors were to submit a written submission establishing their "Demonstrated Prior Experience" and a completed set of self-assessment questions. This first volume was limited to eight pages, of which five were to be a narrative describing at least three relevant projects during the past five years that would demonstrate experience with four categories of information technology services, including cloud migration and machine learning for search queries. Administrative Record ("AR") at 457-58 (the RFQ). Experience as a subcontractor was permissible to meet the experience requirements, but prime contractor experience was preferable. *Id.* at 458.

The agency promised to evaluate the Phase I submissions to ascertain a confidence rating for the offerors' understanding of requirements and likely success in performing the work solicited. *Id.* at 468. Bidders with respect to whom the agency had sufficient confidence were to be notified that they should proceed to make Phase II submissions.

4

Plaintiff, intervenor, and Capital Technology Group were the three offerors invited to Phase II, in which they would again be assigned confidence ratings based on their demonstration of understanding of the requirements and likelihood of successful performance of the work.  The agency would consider four factors as part of the evaluation.  The first was the prior experience from Phase I.  Second was answers to "challenge questions" that would be presented orally at a briefing with evaluators.  The third factor was a written submission regarding the offerors' staffing approach, and the fourth factor was price.  AR at 457 (listing factors); 468 (discussing ratings for factors).  The first factor was the most important, and the first three, when combined, were more important than the fourth, price.[3] *Id.* at 470.    The potential ratings for each factor were "High Confidence, Some Confidence, and Low Confidence."  *Id.* at 468.

Price was to be evaluated for completeness, accuracy, reasonableness, and total evaluated price.  Price and the confidence ratings would be then weighed by the source selection authority, here the Contracting Officer ("CO"), and a best value determination made, meaning that award could be made to an offer without the highest ratings or above the lowest price.  *See id.* at 470.

Plaintiff submitted its Phase I volume on September 4, 2023, and was advised of its passing grade and invited to Phase II on September 11, 2023.  On September 13, the agency provided the topics for discussion at the oral briefing.  On September 25, 2023, plaintiff submitted its Phase II written proposal, and it participated in an oral briefing with the agency on September 28, 2023.  On November 17, 2023, CEDSCI notified plaintiff that, although its price was lower than IgniteAction's, intervenor was found to offer the best value to the government based on its superior confidence ratings.  Both offerors received "High" ratings for Factor 1, demonstrated experience, but plaintiff received "Low" confidence ratings for Factors 2 and 3, Oral Briefing and Staffing Approach.  Intervenor received "Some Confidence" for its ratings on those factors.

[3] The relative importance of the first factor is stated in the Acquisition Plan, AR 306 ("factors are listed in descending order of importance"), but not explicitly in the RFQ itself.  It is implied, however, given that the highest rated offerors for the first factor were invited to submit Phase II proposal volumes.

Also relevant and contemporaneous with the final source selection for the DSDSS contract was MetroStar's final interim CPARS report for the EDDE contract, which was issued on November 1, 2023.  In the first version of that report, in contrast to earlier interim CPARS ratings, MetroStar received negative feedback.  MetroStar engaged in discussions with agency personnel regarding the negative information, and the report was eventually clawed back and substantially revised.[4]  The final CPARS report for MetroStar was positive.  Plaintiff alleges, however, that the interim report is unexplained absent nefarious purpose and that it likely influenced its negative ratings for the DSDSS contract evaluation because the solicitation reserved the right for the agency to examine CPARS ratings.[5]  The author of the rescinded report was Linda Bruckner, who, according to a later-issued internal agency report, had recently attended a training session regarding a more iterative and expansive interim CPARS process, which resulted, according to the memo, in the application of standards to MetroStar's final report different from those used in its earlier ratings.

MetroIBR lodged a protest at the Government Accountability Office ("GAO") on November 27, 2023.  That protest was dismissed when Capital Technology Group filed its initial protest here on December 5, 2023.  Part of the record from GAO was left out of the initial administrative record filed here.  At oral argument on the present motion, defense counsel indicated that that omission will be rectified.

DISCUSSION

In order to pursue its allegations concerning bias in favor of intervenor and intervenor's alleged improper reliance on teaming partners, plaintiff seeks written and deposition discovery of the evaluators and decision makers at the agency and documents from IgniteAction regarding the two CTAs it relied on to meet the experience requirements of Phase I.  Much of the written discovery sought of the agency by plaintiff is averred to be necessary to

---

[4] Defendant challenges the characterization of what happened to the final interim EDDE contract CPARS report.  It is undisputed, however, that the first version of that report issued by CEDSCI was negative to MetroStar and was thereafter substantially revised after MetroStar raised objections to it.

[5] That was explicitly stated in the solicitation because there was no past performance factor, as such, that would normally put the CPARS within an agency's purview during evaluation.

complete the record and is otherwise required to be included in the record by the court's rules. All of the documents sought are detailed in attachment A to its motion (ECF No. 20-1).

In its response brief and during oral argument, defendant acceded to a number of these document requests and has added the requested documents to the administrative record, though it has not yet filed the updated administrative record in this docket.[6] It also supplemented the record with a memorandum from the General Counsel's office of the Department of Commerce ("OGC memo"), in which the Census Bureau is housed, detailing the steps taken by the General Counsel's office to investigate plaintiff's allegations, especially those of bias. The 11-page memorandum is unsigned. Much of it is directed at MetroIBR's merits assertions regarding the agency's evaluation of Factors 2 and 3, presumably because plaintiff urges that the ratings are unexplainable absent bias.

Putting aside the issue of MetroIBR's ratings for Factors 2 and 3, which, as stated during the oral argument, we do not view in and of themselves as evidence of impropriety, plaintiff primarily points to three pieces of evidence, which, in its view, establish the required credible assertions of bias at the agency in favor of intervenor. These allegations center on one individual, Liang-Chi Wang, a CEDSCI official and former ActionNet (one half of IgniteAction) employee. Mr. Wang is one of the evaluators for the DSDSS contract solicitation and was involved in the ratings received in the initial, and since-heavily revised, CPARS report.

In support of its request for discovery, plaintiff submits the sworn affidavit of MetroStar's Vice President of Operations, Ida Ahrens. Ms. Ahrens describes to the court an interaction she had with a CEDSCI employee, who has since been identified as Mr. McQuaid. She relays that on October 3, 2023, shortly after an evaluation team meeting, Mr. McQuaid told her that Mr. Wang was engaging in "internal politicking" in favor of IgniteAction but that MetroIBR would "never be able to prove it." Ahrens Decl. ¶ 11 (ECF No. 20-2). Ms. Ahrens states that this conversation was prompted by MetroStar's decision to part ways with ActionNet as a subcontractor providing several personnel for the EDDE contract effort. Ms. Ahrens states that she wanted to explain the reasons for that decision and MetroStar's plans to replace those employees. During that conversation with

---

[6] In its response brief, defendant also moved to complete the record in this docket. That request is granted.

Mr. McQuaid, she expressed concern with Mr. Wang getting hold of this information as "it was widely perceived that [he] had a close relationship with ActionNet." *Id.*

Buttressing the assertion that evaluator Wang was favorably disposed towards ActionNet, is the sworn affidavit of Mr. Yong Kwon, also submitted by plaintiff in support of this motion. Mr. Kwon is MetroStar's Vice President of Strategy and Growth. He describes an August 13, 2019 request from Mr. Wang to MetroStar to "bring ActionNet on as a subcontractor" on the EDDE contract. Kwon Decl. ¶ 5 (ECF No. 20-3). This, per Mr. Wang, would result in an increased scope of work for MetroStar on the EDDE contract, according to Mr. Kwon.[7] Fearing the results of disappointing Mr. Wang, Mr. Kwon reports that MetroStar agreed to incorporate into the EDDE team four ActionNet employees, who were slotted into new roles created by Mr. Wang for them on the EDDE project. *Id.* ¶ 7. ActionNet's presence on the EDDE contract was later reduced to two positions and then fully terminated on September 29, 2023.

Regarding the termination of ActionNet from the EDDE contract effort, Ms. Ahrens' declaration describes how, upon learning of the change, she notified the Contracting Officer's Representative ("COR"), Sean Kinn, during the late afternoon of September 29, 2023. She requested that Mr. Kinn keep information about the ActionNet termination confidential, and she represents that he later confirmed to her that he had done so. *See* Ahrens Decl. ¶12.c. On October 2, 2023, the next business day, she sent an email at 12:21 pm to CEDSCI leadership, including Mr. Wang, regarding the end of ActionNet's involvement on the EDDE contract and MetroStar's plan to replace the two positions that ActionNet had been filling.

According to Ms. Ahrens, the topic of ActionNet's departure was discussed at a CEDSCI meeting of "ACCs" at 9:00 am on October 2nd. *Id.* ¶ 20.b. Mr. Wang then expressed his displeasure at the timing of notice of ActionNet's departure during a biweekly "sync meeting" on October 4, at which Ms. Ahrens was a participant. *Id.* ¶ 12. He stated that he was displeased to have learned of it as late as midday on the 2nd. Given that Mr. Kinn kept the information regarding ActionNet confidential, Ms. Ahrens

---

[7] It is unclear from the Kwon declaration to whom Mr. Wang made this request and representation. Presumably not to Mr. Kwon or the affidavit would state that explicitly.

concludes that Mr. Wang had to have learned of the ActionNet departure directly from ActionNet in advance of the 9:00 am October 2nd meeting, contrary to his statements during the October 4 meeting.

Lastly,[8] the Ahrens declaration describes an interaction with a former MetroStar employee, Bobi Herrera, that took place shortly after the Census Bureau informed plaintiff that IgniteAction would receive the DSDSS contract award.  Ms. Ahrens avers that, based on her personal observation, Ms. Herrera maintained a close relationship with Mr. Wang when she was working on the EDDE contract for MetroStar.  She was terminated in February 2023 for subpar performance, at which point Mr. Wang expressed his surprise and disappointment.

Ms. Ahrens states that, while Ms. Herrera was on the EDDE team, she informed Ms. Ahrens that she should come to Ms. Herrera if she "ever needed anything from [Mr.] Wang."  *Id.* ¶ 24.  Ms. Ahrens did not maintain contact with Ms. Herrera after she was terminated, but on November 21, 2023, shortly after the award to IgniteAction, Ms. Herrera sent a text message, a screenshot of which is reproduced in the Ahrens declaration.  That message expressed Ms. Herrera's sentiment that Ms. Ahrens, and MetroStar needed Ms. Herrera's services more than she needed MetroStar's employment.  *Id.* ¶ 24.  Ms. Herrera refenced negative "karma" as playing a role in MetroIBR's lack of DSDSS solicitation success.  Ms. Ahrens took this to mean that, owing to Ms. Herrera's close connection with Mr. Wang, MetroIBR would have been in a better position to win the award had it not fired her.

Plaintiff views the Ahrens and Kwon declarations as firmly establishing a credible assertion of bias on the part of Mr. Wang.  It also points to the rescinded interim CPARS report as direct evidence of Mr. Wang's personal involvement that was unfairly adverse to MetroIBR during the evaluation process.  Plaintiff then expansively takes aim at the evaluation process and unfavorable results obtained by MetroIBR as further evidence of questions unanswered by the record and likely only explained by bias.

Defendant, for its part, undertook an effort to meet plaintiff's requests for documentation, which resulted, as mentioned above, in the addition of several documents to the record.  Beyond that, however, it views any further

---

[8] The declaration also describes the negative interim EDDE CPARS report and MetroIBR's successful efforts to get those negative comments rescinded.

supplementation, especially as it involves depositions, as unwarranted. It submits the declaration of Dijon Ferdinand in support of its opposition to the motion.  Mr. Ferdinand is an Assistant Division Chief within the Census Bureau's Acquisition Division.  He details his steps in seeking the documents requested by plaintiff.  He enlisted the help of the new CO on the project, Mr. Matthew Gore, to assist him in searching the files of the former CO, Ms. Lopez (nee Parker during the evaluation process).  Ms. Lopez is represented as having been the repository for the DSDSS solicitation and evaluation files. Her emails along with the files and emails of the COR were searched.  *See* Ferdinand Decl. ¶ 7 (ECF No. 49-1).  Eight responsive documents were identified as detailed in the declaration, *see id.*, but they found no records responsive to five requested categories, including records or transcripts of the oral briefings, records concerning IgniteAction's CTAs, and no documents submitted by prospective offerors to the agency when it issued a request for comments on the draft RFQ in August 2023.  Thus, in defendant's view, it has mooted the document discovery request by undertaking the review sought by plaintiff.

As to the request for depositions, the government opposes on the general basis that plaintiff has not presented any credible assertion of bias and has not established that the discovery plaintiff seeks would be likely to lead to relevant evidence of bias.  It further believes that discovery is unnecessary because the General Counsel's office's investigation and resulting memorandum are sufficient to test and resolve the question of bias. It cites to the court's unpublished decision in O*racle America, Inc. v. United States*, in which we denied the protestor's motion to supplement the record concerning an organizational conflict of interest.  *See Oracle America, Inc. v. United States*, 2019 WL 354705, at *5 (Fed. Cl. Jan. 23, 2019).  The inference to be drawn is that, just as in *Oracle*, the court should defer to the agency's consideration of these allegations.

Defendant also urges that the fact that this procurement was undertaken pursuant to FAR part 8, which involves a less formal and quicker process, ought to be considered when weighing the sufficiency of the agency's record keeping during the evaluation process.  Nothing spurious should be assumed by the fact that there is no record of the oral briefings or the consensus rating evaluation process, according to the government, because this level of informality is all that is called for under FAR part 8.

Intervenor, for its part, joins the government's opposition and specifically opposes any discovery of IgniteAction as beyond the scope of

the court's review in an administrative review action and as unnecessary to resolve plaintiff's challenges to IgniteAction's CTA status.  It further urges that discovery is unnecessary to resolve the question of bias because the agency has already undertaken its own investigation, which has been added to the record (OGC memo).  We will address the written discovery and deposition requests separately in turn.

I.  Legal Standards

Although bid protests are administrative review actions, *see* 28 U.S.C. 1491(b)(4) (setting the standard of review to that provided by the Administrative Procedures Act), generally constrained to the contemporaneous paper record at the agency during the challenged act or omission, supplementation of the record is permissible, and even necessary, when effective judicial review would be frustrated, or rendered impossible, by the absence of the evidence sought to be added to the record.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).  As we explained in *Starry Associates, Inc. v. United States*, this is the case when the record is missing information that "'by its very nature would not be found in an agency record—such as evidence of bad faith . . . or the content of conversations.'"  125 Fed. Cl. 613, 621 (2016) (quoting *Info Reliance Corp. v. United States*, 118 Fed. Cl. 744, 747 (2014)).  Here, both of those bases— bad faith and oral conversations—are implicated by the bias allegations raised by plaintiff and the agency's reliance heavily on oral presentations and unrecorded, on the spot evaluations.

The presumption of regularity as it applies to government officials is not a bar to discovery into the topic of bias when the protestor can make a "threshold showing of "'Motivation for the Government employees in question to have acted in bad faith'" or have acted in a manner that is "hard to explain absent bad faith.'"  *Id.* at 622 (quoting *Beta Analytics Int'l v. United States*, 61 Fed. Cl. 223, 226 (2004)).  The protestor must also show that the discovery sought "could lead to evidence which would provide the level of proof required to overcome the presumption of regularity."  *Beta Analytics*, 61 Fed. Cl. at 226.

II.  Written Discovery

We begin with the remaining documents that plaintiff sought from the agency and its request to serve written discovery on intervenor.  Given the nature of the documents sought, we view these requests as not aimed at

supplementation, but primarily at completeness of the record, at least as it pertains to the Census Bureau.

A.  Government Documents

The question then is whether defendant's efforts viz Mr. Ferdinand are sufficient to have met the government's obligations to furnish a complete administrative record, i.e., a complete set of documents contemporaneous with the procurement process at issue.  We take Mr. Ferdinand's declaration at face value, and we note that several documents were added to the record as a result of his effort.  It is apparent from the declaration and defense counsel's explanation at oral argument, however, that Mr. Ferdinand did not undertake a document search beyond the former CO's files and those of the COR, Mr. Kinn.  We are satisfied, that as to those repositories, no further documents are necessary to complete the record.

It is not clear, however, that Ms. Lopez's and Mr. Kinn's files in fact contain all of the relevant documentation, especially as might concern communications regarding the evaluation process involving Mr. Wang and the rest of the evaluation team.  In normal circumstances, the court might not expect the administrative record to contain every manner of rote internal agency communication regarding a solicitation and evaluation process because many such documents would not be germane to the question of what the agency did or considered as part of the evaluation.  Here, however, the agency availed itself of the more "flexible" procedures allowed by FAR part 8, instead of part 15.  This rationale was touted by the government at oral argument as an explanation as to why the record was scant with regard to the individual evaluators.  From our perspective, however, this makes it more important to ensure that an adequate search for documents was undertaken.  One of the factors that fed the agency's Phase II confidence rating—dispositive for the CO's best value determination—was the oral presentation.  Other than the challenge questions posed, there is no record whatsoever of the offerors' presentations nor the evaluation team's rating process.  Given the credible assertions of impropriety, a search of the entire evaluation team members' files, including emails, is warranted on this basis alone.

Defense counsel represented at oral argument that the evaluation team traded notes via an internal messaging system during and shortly after the oral presentations.  The team came to a consensus rating on the spot via that messaging system and a shared electronic document.  We have only the result, i.e., the confidence rating assigned for that factor and the others (one

"holistic" rating for each non-price factor).  Although the lack of formality in FAR part 8 schedule contracting may be a virtue from the agency's perspective, the total lack of transparency affords the court and the public virtually no way to understand the decision-making process when a serious challenge of bias is lodged.  Thus, we conclude that it is appropriate, at a minimum, for the agency to search the files, including emails, of each of the individuals involved in the rating decisions.

The ex-post OGC memo does not moot this need.  Much of the memo was expended in an effort to further justify the snap consensus ratings.  We view such explanations, at least as they concern the merits-focused questions, as inappropriate bootstrapping.  The memo is not a contemporaneous record of the evaluation process.  A search of the evaluators' files has the potential to reveal further information that can shed light on the credible issues raised by plaintiff, and thus it must be done.  We also find that the OGC memo falls short, as further discussed below, of meeting each of the assertions in plaintiff's affidavits.

B.  IgniteAction Documents

The same is not true of intervenor's files, however.  Plaintiff seeks discovery of IgniteAction aimed at determining whether it misled the agency regarding the CTAs it relied on during Phase I of the evaluation.  We find the record complete in this regard.  The agency, and now the court and the parties, have the representations made in intervenor's proposal volumes, and we have the CTAs presented to the Census Bureau. Nothing further is needed to test plaintiff's challenge to the reasonableness of the agency's consideration of the CTAs themselves.

We likewise find no need for supplementation in this regard as protestor has not made a showing that there is any evidence missing that is necessary for effective judicial review.  Defendant and intervenor contend that copies of the CTAs were unnecessary, per the RFQ.  And plaintiff alleges, nevertheless, that the subsequent submission of documents purporting to be CTAs from IgniteAction reveals a patent inconsistency between those agreements and intervenor's Phase I proposal.  MetroIBR challenges the sufficiency of the provided CTAs, both as to their operative date and whether they are sufficiently binding on the teaming partners or definite as to their role in performing the work to have assured the agency that it could rely on the teaming partners to provide the experience it was

looking for from intervenor.  Those issues can be argued from the existing record.  There is therefore no need for discovery from intervenor.

III.  Depositions.

That leaves the question of whether plaintiff has made the requisite showings to justify depositions of agency personnel.  We find that it has.

We have direct evidence from plaintiff, via the Ahrens Declaration, that at least one agency official viewed Mr. Wang as improperly influencing the procurement in favor of ActionNet.  Defendant's suggestion at oral argument that Mr. Wang's "politicking" was best understood in the context of a normal back and forth discussion during an agency evaluation is unpersuasive.  If the intimation was not intended to cast suspicion, it would not have been followed with the caution that plaintiff could never prove anything improper.  Given Mr. Kwon's assertions that Mr. Wang was responsible for ActionNet's inclusion in MetroStar's EDDE team and that Mr. Wang, in fact, created the roles necessary to include new ActionNet personnel, we have a history and context in which to view Mr. McQuaid's statements regarding Mr. Wang's "politicking" during the evaluation at issue.  That history also suggests a motive for Mr. Wang's actions: an effort to aid ActionNet.

We also have the agency's odd behavior with respect to the now-rescinded negative interim CPARS ratings report of MetroStar.  Although the record now contains the agency's attempted ex-post facto explanation of Ms. Buckner's mistaken application of new criteria in the final interim report, there remain unresolved questions, even if we credit fully the OGC memo. The report involved Mr. Wang's input, *see* AR at 1516-17 (showing Wang providing CPARS feedback for MetroStar for inclusion in the report), and it was issued contemporaneously with the agency's evaluation of plaintiff's offer to continue servicing CEDSCI's data dissemination mission, the same effort it was being rated for by the interim CPARS report.  The solicitation reserved to the Census Bureau the right to consider CPARS ratings.  Even if Mr. Wang was not biased, plaintiff ought to have the right to explore with evaluators whether those now-rescinded ratings influenced the evaluators negatively with respect to plaintiff's proposal. [9]

---

[9] We recognize that the OGC memo represents that no evaluators referenced any CPARS reports in coming to their consensus ratings.  That is insufficient, however, to meet the allegation made by plaintiff.  MetroIBR presents

14

We also know, via Ms. Ahrens, that Mr. Wang apparently misrepresented the origin of his knowledge regarding the discontinuation of ActionNet's role on the incumbent contract.  It makes little sense for him to have made that misrepresentation to Ms. Ahrens unless he was hiding the source of his information.  Although there may be some innocent explanation, the question is unresolved on the record as it stands and is hard to explain absent some notion of bias or intent to deceive on the part of Mr. Wang.

Lastly, the text message from a disgruntled former employee, while not normally the sort of allegation that would give the court pause, but there is some support for the assertion of bias here given Ms. Ahren's statement that Ms. Herrera represented herself as having influence with Mr. Wang.  The timing of that alleged communication is also indicative of a potential involvement by Mr. Wang in informing Ms. Herrera.  As she put it to Ms. Ahrens, "karma" had served plaintiff with the result it deserved.

In light of these credible allegations supported by sworn affidavits, we conclude that the record as it stands does not resolve whether Mr. Wang was partial towards ActionNet and had animus to plaintiff and Capital Technology Group.  We find that depositions of the agency personnel involved are warranted because the statements of Mr. McQuaid, Mr. Wang, and Ms. Herrera are "hard to explain absent bad faith."  *Beta Analytics*, 61 Fed. Cl. at 266.  Depositions of those involved could lead to evidence necessary to overcome the presumption of regularity afforded government personnel.  *Id.*  Mr. McQuaid's statement to Ms. Ahrens itself satisfies that showing and justifies exploration by discovery.

Nor can we defer to the Commerce Department's own investigation into this matter. The record here, unlike that in *Oracle*, does not include a meaningful explanation of how the agency undertook its investigation or any

---

evidence of potential bias and a history of partiality in favor of another offeror by one of the evaluators.  That same evaluator provided input into the questioned CPARS report, thus bringing those CPARS ratings into question and making them the proper subject for further evidentiary exploration via discovery.  Even if ultimately the CPARS report played no role in the other evaluators' minds, discovery on the topic may reveal additional information regarding Mr. Wang's alleged favoritism.

other indicia of reliability or reasonableness beyond the unsigned OGC memo.[10] Most critically, it does not explore all of the issues raised by the protestor. The OGC memo records that the evaluators were asked whether they perceived any influence by Mr. Wang in favor of ActionNet. Although the evaluators answered in the negative, there is no record of OGC having asked Mr. McQuaid directly about his comments to Ms. Ahrens. There is a direct contradiction between the sworn statement of Ms. Ahrens and the more general representations made in the unsigned OGC memo that Mr. McQuaid did not remember any undue influence by Mr. Wang.

There is likewise no record of an investigation into how and when Mr. Wang learned of ActionNet's departure from the incumbent EDDE contract effort. As explained above, there was an apparent misrepresentation made to Ms. Ahrens in this regard. Given the circumstances, that suggests an attempt at deceit. There may be an innocent explanation, but the OGC investigation did not explore the contradictions.

Further distinguishing the investigation here from that performed by the agency in *Oracle* is the ultimate conclusion reached by the investigators in that case. There, although the agency found, at a minimum, the appearance of impropriety and bias, the thorough investigation revealed that those officials in question could not have influenced the procurement process in the manner alleged by the protester. *Oracle America, Inc. v. United States*, 144 Fed. Cl. 88, 121-25 (2019). The OGC memo makes no such finding. It seems clear that Mr. Wang was in a position to influence the award to intervenor, had a history of actions favorable towards intervenor, and

---

[10] The issues triggered in deciding an organizational conflict of interest ("OCI") and a Procurement Integrity Act ("PIA") investigation are different in kind from those raised here. Although the OCI issues in *Oracle* necessarily involved allegations of bias on the part of certain agency personnel, OCIs and a PIA investigation involve their own set of statutory and regulatory procedure and standards that control the investigation and necessarily constrain the subsequent judicial review thereof. The record in *Oracle* contained extensive materials on which the agency relied and transcripts of testimony heard during a GAO factual hearing on the matter. In contrast, here, we have only the memo itself. The memo concludes that there was no inherent conflict of interest because Mr. Wang had not been recently compensated by ActionNet, but that does not address whether he was otherwise biased in favor of intervenor.

undertook other actions which are hard to explain absent bias.  We therefore will allow protestor to probe these issues as detailed below.

CONCLUSION

Because there are unexplained and unresolved questions regarding the evaluation process and Mr. Wang's potential improper influence in favor of intervenor during that process, the record must be completed and supplemented in the following ways:

1. The agency must search the files of all of the DSDSS evaluation team members, including their emails, for documents responsive to plaintiff's requests in Attachment A to its motion (ECF 20-1). It must then correct the record by including them in the administrative record in this case.

2. The administrative record is hereby supplemented with the declarations of Ms. Ahrens and Mr. Kwon, which were attached to plaintiff's motion.  Defendant is directed to include them in the administrative record.

3. The record is further opened to permit plaintiff to take the depositions of the following individuals:

   a. The DSDSS evaluation team—
      i. Liang-Chi Wang
      ii. Ryan Harper
      iii. Sameer Malik
      iv. John McQuaid, and
      v. Mike Walsh

   b. The former Contracting Officer, Carrie Lopez, and her representative, Sean Kinn.[11]

   c. Linda Bruckner.

---

[11] We note that plaintiff did not specifically request in its motion to depose Mr. Kinn.  We take that as an oversight given his role in this matter and more specifically his involvement in the final interim CPARS report.  Plaintiff need not depose him if it chooses, however.

17

Accordingly, the following is ordered:

1. Plaintiff's motion to supplement the record and for discovery is granted in part as detailed above.

2. Defendant's request to complete and correct the record is granted.

3. The parties are directed to confer and to file a joint status report, on or before July 24, 2024, proposing a schedule to accomplish the permitted discovery and correction/supplementation of the record.


s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge